IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN S. GOLD, et al.          :          CIVIL ACTION
                              :
          v.                  :
                              :
STATE FARM FIRE AND CASUALTY  :
COMPANY                       :          NO. 11-1187


MEMORANDUM

McLaughlin, J.                                July 23, 2012

          This case arises out of water damage occurring at the
home of the plaintiffs, Alan and Frances Gold, and a homeowners
insurance policy they had with the defendant.  The plaintiffs'
home suffers mud and water damage following heavy rains.  They
made claims under their policy in August 2009 and July 2010 for
mud damage to their basement, which State Farm denied on the
basis of a policy exclusion for water damage.  The plaintiffs
brought the instant suit in the Court of Common Pleas of
Montgomery County, alleging breach of contract and bad faith in
connection with those denials.  The defendant removed the action
to this Court and has moved for summary judgment on both counts.
The Court will grant the motion in part and deny it in part.


I.   Summary Judgment Record

          The plaintiffs own a home at 7916 Rogers Road in Elkins
Park, Pennsylvania.  The home is a split-level house with four
levels.  Below grade level, the house has a basement with cinder-
block walls, part of which is finished and part of which contains

a storage area.  The level above the basement is at street level and contains a garage, family room, and laundry room, each of which has a concrete slab running underneath.  Dep. of Frances Gold, Aug. 17, 2011, at 10-14, 23-25. 27, Ex. L.[1]

The Gold home was covered by State Farm homeowners insurance policy number 78-E1-0781-1.  Ex. B.  The policy provides that State Farm will "insure for accidental direct physical loss to the property . . . except as provided in SECTION I - LOSSES NOT INSURED."  Id. at 7.  Among the exclusions in Section I, the policy states:

> We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events.  We do not insure for such loss regardless of: (a) the cause of the excluded event; (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: . . . .
>
> > c.  Water Damage, meaning:
> >
> > > (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or

---

[1] The defendant attached Exhibits A through R to its Motion for Summary Judgment.  The exhibits to the plaintiffs' opposition continue this labeling in series with Exhibits S, T, U, and V. For simplicity, the Court will refer to the letter identifying each exhibit without reference to the filing to which it was appended.

> spray from any of these, all
> whether driven by wind or not;
>
> (2) water or sewage from outside
> the residence premises plumbing
> system that enters through sewers
> or drains, or water which enters
> into and overflows from within a
> sump pump, sump pump well or any
> other system designed to remove
> subsurface water which is drained
> from the foundation area; or
>
> (3) water below the surface of the
> ground, including water which
> exerts pressure on, or seeps or
> leaks through a building, sidewalk,
> driveway, foundation, swimming pool
> or other structure.

Id. at 10.

Because of the relation of the Golds' home to the ground and the way in which their driveway slopes, their home is subject to water incursions during heavy rainstorms.  The house has a french drain in the driveway, but if too much water is present, water "will go back up the slope [of the driveway] and it will go . . . under the garage door."  At one point, the flooding was so severe that water ran down the steps from the laundry room to the basement.  F. Gold Dep. 74-78.

The Golds submitted a claim to State Farm for water damage occurring in August 2004 from rain entering the home and causing damage on the first two levels.  State Farm invoked the surface water exclusion to deny the claim.  Ex. D.

Between July 20, 2009 and August 1, 2009, severe

rainstorms occurred in the area in which the Gold home was located, but the Golds were out of town.  On August 4, 2009, after they had returned, Frances Gold discovered water on the second level of her home that had gone through the wall separating the garage and family room.  She discovered "a three foot square area of mud a quarter of an inch thick" in the carpeted area of the basement; she later discovered some mud in the corner of the basement area, near the water heater.  All of the damage had occurred while they were out of town.  F. Gold Dep. 60-61, 69, 73-77.

Gold telephoned her State Farm agent's office in early August and spoke with an individual named Christine Roming regarding the damage that had occurred while they were away. Roming reported to Gold that she was writing down that "[w]ater has been infiltrating through the walls," and advised Gold that any claim would be denied; Gold told her that she had not told Roming that water was coming through the walls.  Roming responded, "[y]eah, it's coming through the walls.  It's the same thing."  When Gold told her that it was coming through the floor, "[Roming] said, 'Oh, it doesn't matter,' just like that."  F. Gold Dep. 79-80, 82-85.

State Farm's claims agent, Adam Juliano, contacted Frances Gold on August 12, 2009 to discuss the claim she had submitted.  There is a dispute as to the contents of this

conversation.  The defendant's record of the claim notes that "[w]ater has been infiltrating through the concrete walls," which Juliano said would have come from a statement by the insured. Claims File at SF004, Ex. E; Dep. of Adam Juliano, Oct. 10, 2011, at 33.  Frances Gold testified that Juliano told her that water had come through the walls, and that she said, "No, it didn't come through the walls.  That's what [Roming] wrote.  I did not say that to her.  It didn't came through the walls[;] it came through the floor."  F. Gold Dep. 93.

During her telephone call with Juliano, Gold also asked: "'What if you give me a date that is convenient for you and I hire a plumber . . . to see if there's any plumbing underneath [the HVAC system] that may be broken, because this way if it is, then it's covered, if it's not, then it's not covered. And I will go to my expense to do that.' And [Juliano] said, 'No, that's not necessary.'"  Gold testified that "I wanted [Juliano] or someone from State Farm to come out and look at [the mud in the basement] to see what the cause was, and he said, 'No, it's standing water.'" F. Gold Dep. 93-94.[2]

Juliano spent a total of at most twelve minutes investigating the claim (including reviewing the 2004 claim),

---

[2] Juliano testified that "[i]f the policyholder had asked that I send someone out to inspect or to confirm the source of the damage then it would have been done and logged in the file. . . . I would never refuse a request to send someone out." Juliano Dep. 40.

speaking with Frances Gold, and dictating a denial letter.
Juliano Dep. 36, 54, Ex. M.  The letter, dated August 13, 2009,
states that "you had advised me that there was water and mud
damage to your basement due to water entering through the
concrete walls. . . . I advise you at this time that there is no
coverage for surface or subsurface water under your Homeowners
Policy. . . . The denial of your claim is based on the specific
facts outlined in this letter.  Please contact me if the facts
are incorrect or if any additional information regarding this
claim should arise."   Letter from Adam Juliano to Alan and
Frances Gold, Aug. 13, 2009, at SF019-20, Ex. F.  The Golds did
not respond to this letter.  Frances Gold stated that she felt a
response would be pointless because she had told Juliano over the
phone that State Farm's record of her reporting that water was
infiltrating through the basement walls was incorrect.  F. Gold
Dep. 95.

          In July 2010, another heavy rainstorm occurred during
which "water came in through the garage again and went down into
the laundry room," along with "additional mud coming up from the
same area [in the basement]," which had "come up through the slab
floor" as with earlier storms.  F. Gold Dep. 104-09.  The
plaintiffs submitted an additional claim to State Farm and
described damage similar to that occurring in August 2009.  In
response to a request by the plaintiffs, State Farm sent Charles

Warner, a claims representative, to the home for an inspection on July 23, 2010.  Frances Gold told Warner that mud had entered the basement "recently in conjunction with some big storms."  During Warner's inspection, Gold told Warner that mud was entering the basement but that no water appeared to be coming from the basement walls, although the home's earlier water problems involved water seepage through the basement walls.  Warner told Gold that he "wasn't sure of the source, at the beginning of [his] investigation," but that through eliminating other potential causes, he concluded "that the loss was in [his] opinion subsurface and not a covered loss."  Dep. of Charles Warner, Oct. 10, 2011, at 57-59, Ex. N; Activity Log, July 23, 2010 at SF007, Ex. G.  A letter denying the 2010 claim was sent to the Golds on July 23, 2010.  Ex. I.

In 2010, the plaintiffs hired Kevin Schechterly, a geologist, to review the damage to the property.  Schechterly issued two reports.  The first is dated November 10, 2010.  It states that the Gold home was visited on November 5, 2010, "[t]o observe the water infiltration issues being experienced within the garage and basement areas of [the] home."  The report ultimately concludes that "saturated subsurface soil eventually allows for water to flow upward into the basement at the concrete slab/block wall interface."  Ex. J.  The second report, issued on August 4, 2011, does not mention an additional site visit, but

-7-

was prepared following Mrs. Gold's suggestion to Schechterly that
the water issue in the house could be related to the plumbing.
Gold's suggestion appears to have been prompted by a discussion
she had with her pharmacist, who offered it as a potential cause.
F. Gold Dep. 119.[3]  The second Schechterly report states:

> Areas of sediment were observed on the
> basement floor where water has obviously been
> present.  However, sediment was not observed
> on the basement walls.  This indicates that
> the sediment was transported from beneath the
> slab and not from the exterior surface and
> down the walls. . . .
>
> As the water that enters the
> basement is not believed to be coming from
> the exterior surface, it is likely that it
> originates below the slab.  The water then
> enters the basement floor between the
> slab/wall interface or through cracks and
> drains within the floor.  The origin of the
> water is not believed to be the regional
> groundwater table.  A possible cause of the
> water is broken utility lines under the
> floor.  These lines could include the HVAC
> system, plumbing, or other utilities.  The
> only other potential cause is saturation of
> the subsurface soil adjacent to the house.
> The saturated subsurface soil would
> eventually allow for water to flow upward
> into the basement at the concrete slab/block
> wall interface.

Letter from Kevin Schechterly, Earth Eng'g Inc., to Alan &

---

[3] At her deposition, when she was asked about the two
reports from Schecterly, Mrs. Gold said: "One, when he initially
did it, and then the other one, which he updated, because, he
said 'I hadn't thought about plumbing being an issue, but it is a
possibility."  And the reason I asked him that was because I had
spoken to my pharmacist, actually, and he said, 'Oh, I know what
you have.'  He said, 'We had the same problem with our
house. . . . And there was a plumbing problem in the
interior.[']" F. Gold Dep. 119:16-120:6.

Frances Gold, Aug. 4, 2011, Ex. K.

State Farm retained Gary Popolizio, a building engineer, to inspect the Gold property and issue a report on the cause of the water issues.  Popolizio inspected the property on November 8, 2011, and issued a report on December 22, 2011.  He concluded that "the home has been experiencing the effects of ground, surface, and rainwater intrusion due to the manner in which the property is graded coupled with a lack of maintenance and upkeep of the exterior drainage system over a period of time."  His comparison of weather records to the dates of reported damage at the home led him to "determine that water and mud inflow was incurred due to rain producing surface and subsurface effects on the [Golds'] home."  Report of Gary Popolizio, Ex. P.

State Farm also retained a certified Master Plumber, Thomas J. Pileggi, to inspect the Golds' home.  He concluded in a report dated December 23, 2011 that "no visible leaks were found" in the piping of the home and that "neither the plumbing water piping nor the drain piping caused any water and or mud infiltration into the home."  Pileggi inspected the drain pipe with a camera and discovered

> debris and what appear to be roots inside the pipe approximately 12 feet from the water discharge.  The camera could not pass this point because of the blockage.  The blockage in the pipe would cause the rain water to back up into the catch basin, fill with rain

> water and then overflow with rain water,
> flooding the area in the front of the garage
> and cause water to enter the house.

Ex. O.

The Golds filed their complaint in the Court of Common Pleas of Montgomery County on January 25, 2011.  The complaint alleges that the Golds suffered a loss covered by their insurance policy "[o]n or about July 30, 2009 through August 1, 2009," and that State Farm's failure to pay benefits for that loss under the policy constituted a breach of contract and insurance bad faith. Ex. A ¶¶ 5, 9-15.

II.  <u>Analysis</u>[4]

The defendant argues that the instant suit is barred by a one-year limitations period found in the policy, and that even if that limitations period does not apply, there is no triable issue of fact as to whether surface or subsurface water caused the damage in the Golds' home.  State Farm also argues that it is

---

[4] A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The court must consider the evidence in a light most favorable to the nonmoving party.  Once a properly supported motion for summary judgment is made, the burden of production shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

entitled to judgment as a matter of law on the bad faith claim because it had a reasonable basis for denying the Golds' claim.

There exists a threshold question of whether the claims at issue in this suit relate only to the 2009 denial of coverage or also to the 2010 denial of coverage.  Although the complaint refers only to events occurring in 2009, at oral argument counsel for the plaintiffs stated that they were proceeding with claims as to both events and had conducted discovery accordingly. Counsel for the defendant stated that she believed that only the 2009 claim was properly at issue, but that in an abundance of caution, she had briefed the 2010 claim on summary judgment. Because the parties have briefed both sets of claims in their papers and stated at oral argument that both had been subject to discovery, the Court considers claims in connection with both the 2009 and 2010 denials of coverage.[5]

The defendant is entitled to judgment on the contract claim because the plaintiffs have not presented evidence that raises a genuine dispute on the issue of causation.  The defendant is also entitled to judgment on the plaintiffs' allegations of bad faith related to the 2010 investigation of

---

[5] The plaintiffs' opposition to the instant motion also repeatedly asserts that both the 2009 and 2010 claims are at issue.  See, e.g., Pls.' Ans. to Mot. ¶ 8 ("It is denied that the Golds' claim is predicated solely on the denial of their claim in August of 2009.  Rather, the Golds' claim encompasses multiple breaches of policy and instances of bad faith.").

their claim, but not with respect to the 2009 investigation.

A.   <u>Limitations Period</u>

State Farm argues that a one-year limitations period in the policy bars the instant suit, because although the plaintiffs filed a praecipe for writ of summons within the one-year period, the complaint was not served until after that period had expired. Accordingly, State Farm argues, the plaintiffs' breach of contract claim is time-barred.[6]

The policy's contractual limitations period states: **"Suit Against Us:** No action shall be brought against us unless there has been compliance with the policy provisions.  The action must be started within one year after the date of loss or damage."  Ex. B at 14 ¶ 6.  Although the Golds filed a Praecipe for Writ of Summons in April 2010, they did not give it to the sheriff to effectuate service until November 17, 2010.  It was ultimately served on November 23, 2010.  Exs. Q, R.  The plaintiffs argue that the policy only required them to file their writ of summons with the prothonotary in order to satisfy its terms.

The Pennsylvania procedural rules provide that "[a]n

---

[6] The contractual limitations period does not operate to bar the bad faith claim brought in Count II.  Bad faith claims arise separately from a contract and are not governed by contractual limitations periods found in insurance policies.  <u>See</u> <u>March v. Paradise Mut. Ins. Co.</u>, 646 A.2d 1254, 1256-57 (Pa. Super. Ct. 1994).

action may be commenced by filing with the prothonotary (1) a praecipe for a writ of summons, or (2) a complaint." Pa. R. Civ. P. 1007. The plaintiffs argue that this is all that is required to comply with the contractual limitations period. In interpreting this rule, however, the Pennsylvania Supreme Court has held that "a writ of summons shall remain effective to commence an action only if the plaintiff then refrains from a course of conduct which serves to stall in its tracks the legal machinery he has just set in motion." Lamp v. Heyman, 366 A.2d 882, 889 (Pa. 1976). The Lamp court found that a literal reading of the rule had created "potential for abuse . . . which permits a plaintiff to keep an action alive without proper notice to a defendant merely by filing a praecipe for a writ of summons and then having the writ reissued in a timely fashion without attempting to effectuate service." Id.

        The Lamp court examined the policies behind statutes of limitations and the purposes of Pennsylvania's procedural rules, and concluded that Rule 1007 needed to be "qualified . . . . Our purpose is to avoid the situation in which a plaintiff can bring an action, but, by not making a good-faith effort to notify a defendant, retain exclusive control over it for a period in excess of that permitted by the statute of limitations." Id. at 889. The "good-faith effort" is satisfied when the defendant has received actual notice of a claim, provided that the plaintiff

-13-

has not "demonstrated an intent to stall the judicial machinery or where plaintiffs' failure to comply with the Rules of Civil Procedure has prejudiced defendant."  McCreesh v. City of Phila., 888 A.2d 664, 674 (Pa. 2005).

It is undisputed that the Golds did not effectuate service within the contractual limitations period, but State Farm has presented no evidence that the plaintiffs intended to stall the judicial machinery in failing to direct the sheriff to serve the writ.  Nor has it presented evidence that it was prejudiced thereby.  Id.  Moreover, in light of McCreesh's suggestion that actual notice of suit "may not be absolutely necessary so long as prejudice did not result," the Court will not, under the circumstances, exercise its discretion to invoke the "harsh sanction of dismissal for non-prejudicial procedural missteps." Id. at 674 n.20, 669-70.  The Court will, therefore, proceed to address the contractual claim on the merits.

B.   Breach of Contract

The plaintiffs assert that the defendant's failures to pay benefits under the policy for their claims in 2009 and 2010 constitute breaches of contract.  The defendant argues that the exclusion for surface or subsurface water applies, relieving it of its obligation to cover the plaintiffs' loss.  The plaintiffs' argument is essentially that because State Farm has not definitively identified the cause of the damage to the basement,

-14-

it is not entitled to invoke the exclusion.  They are incorrect.
The defendant has presented evidence sufficient to prove its
affirmative defense that the policy exclusion was properly
invoked because surface or subsurface water caused the damage to
the Golds' home in 2009 and 2010.  The plaintiffs have not made
any showing by which a reasonable juror could conclude otherwise.
The defendant is thus entitled to summary judgment.

A breach of a contract action involves the existence of
a contract, a breach of a duty imposed by the contract, and
damages.  Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710,
716 (Pa. Super. Ct. 2005).  "Where an insurer relies upon a
policy exclusion as the basis for its denial of coverage . . . ,
the insurer has presented an affirmative defense, and
accordingly, bears the burden of proving such defense."  Spece v.
Erie Ins. Grp., 850 A.2d 679, 682 (Pa. Super. Ct. 2004).

State Farm argues that although the exact cause of the
damage may be unknown, surface or subsurface water[7] caused the
damage to the Golds' basement after heavy rains in August 2009

---

[7] Although the policy refers to "water below the surface of
the ground," "surface water" is not defined in the policy.
Pennsylvania courts, however, have long understood that "surface
water" is an unambiguous term.  "[S]urface waters are commonly
understood to be waters on the surface of the ground, usually
created by rain or snow, which are of a casual or vagrant
character, following no definite course and having no substantial
or permanent existence."  Richman v. Home Ins. Co. of N.Y., 94
A.2d 164, 166 (Pa. Super. Ct. 1953) (internal quotations
omitted).

and July 2010.  It relies upon two lines of evidence to advance
this conclusion.  First, it points to Mrs. Gold's testimony that
when heavy rainstorms occur that cannot be handled by the french
drain in the Golds' driveway, water flows into the garage, to the
laundry room, and down into the basement.  Second, the reports of
Popolizio and Pileggi conclude that surface or subsurface water
was the cause of the damage to the Golds' home and that broken
utility pipes were not the cause of the damage.

       At oral argument, plaintiffs' counsel conceded that the
only record evidence potentially raising an issue of disputed
fact on causation is Schechterly's second report.  That report
includes the statement that "[a] possible cause of the water is
broken utility lines under the floor," which the plaintiffs
contend would not constitute damage from surface or subsurface
water.[8]  Testimony not based on firsthand knowledge or
observation is admissible provided that such opinion testimony
has "a reliable basis in the knowledge and experience of [the

_____

[8] The defendant argues that broken utility lines would still
constitute "underground water from any source," Mot. 24 (citing
Collella v. State Farm Fire & Cas. Co., 407 F. App'x 616, 618 (3d
Cir. 2011) (nonprecedential) (concluding that "subsurface water"
exclusion applied to bar claim for water damage caused by
underground utility pipe "below the concrete slab" in the
appellant's basement)).  In addition to not being precedential,
Colella is distinguishable because there, it was undisputed that
water in pipes below Colellas' house would have to pass through
soil before entering the house, whereas here, any broken utility
line is alleged to be "under the floor," but not necessarily
below the surface of the ground (as required by the language of
the exclusion).

expert's] discipline."   Daubert v. Merrell Dow Pharms., Inc., 509
U.S. 579, 592 (1993).

Schechterly's first report states that he inspected the
Gold property on November 5, 2010, and concluded that water
overflowing from the Golds' drain would cause inflow into the
garage and saturate the subsurface soil.  After Mrs. Gold had
spoken to her pharmacist, who had experienced water problems in
his or her home, she suggested to Schechterly that broken utility
pipes could have caused the water damage.  At that point, over
nine months after his initial inspection of the property,
Schechterly issued his second report, which was substantially
identical but included an additional sentence opining that broken
pipes could have caused the damage.

Schechterly's second report offers no support for the
reasoning behind his later conclusion.  His opinion is therefore
unreliable and no reasonable juror could rely upon it to conclude
that the cause of the damage to the home was anything other than
surface or subsurface water.  On the record before the Court, the
foundation for Schechterly's opinion is a suggestion he received
from Mrs. Gold on the basis of a conversation she had with her
pharmacist.  The plaintiffs do not argue, or present any
evidence, that Schechterly returned to the property to make this
conclusion, that he inspected the plumbing at the house during
his initial visit, or that he consulted any additional materials

in reaching his later conclusion that broken utility pipes "possibl[y]" caused the damage to the property.

        The plaintiffs repeatedly argue that the burden of proving that a policy exclusion applies is allocated to the insurer in an action under an "all-risk" insurance policy.  Pls.' Opp. 7 (citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)).  The defendant has presented evidence showing that the cause of the damage, whether surface or subsurface water, was covered by the policy exclusion.  This is sufficient to meet its burden.  The plaintiffs' evidence does not raise a triable issue of fact as to the cause of the damage to their home.  The Court will, therefore, grant the motion as to the breach of contract claim.

    C.   Bad Faith

        The plaintiffs allege that the conduct of the defendant in investigating and denying their claim constitutes bad faith under Pennsylvania law, 42 Pa. Cons. Stat. § 8371.  To recover under the bad faith statute, the plaintiffs must show, by clear and convincing evidence: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994), appeal denied, 659 A.2d

-18-

560 (Pa. 1995)).

Actionable bad faith encompasses behavior beyond the denial of a claim without a reasonable basis, including an insurer's investigation of a claim.  "The broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer . . . .  Therefore, . . . [a]n action for bad faith may also extend to the insurer's investigative practices . . . ."  Hollock v. Erie Ins. Exch., 842 A.2d 409, 415 (Pa. Super. Ct. 2004) (en banc) (internal quotations omitted).  "Implicit in Hollock's holdings is the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured."  Bombar v. W. Am. Ins. Co., 932 A.2d 78, 92 (Pa. Super. Ct. 2007) (citing Condio v. Erie Ins. Exch., 899 A.2d 1136, 1142-44 (Pa. Super. Ct. 2006)).

### 1.   Severability from Contract Claim

The defendant argues that without a viable contract claim the plaintiffs' bad faith claim necessarily fails.  Under the circumstances this is inaccurate.

The bad faith statute has been interpreted to provide a "cause of action which is separate and distinct from the underlying contract claim."  March v. Paradise Mut. Ins. Co., 646 A.2d 1254, 1256-57 & n.5 (Pa. Super. Ct. 1994) ("[A]s the language of section 8371 does not indicate that success on the contract claim is a prerequisite to success on the bad faith

claim, we find that an insured's claim for bad faith brought pursuant to section 8371 is independent of the resolution of the underlying contract claim.").

The Pennsylvania Superior Court has concluded that it is "settled law that an insured may pursue a bad faith claim . . . without regard to the status of a parallel contractual claim"; indeed, a bad faith claim statute "provides an independent cause of action to an insured that is not dependant upon success on the merits, or trial at all, of the contract claim." Nealy v. State Farm Mut. Auto. Ins. Co., 695 A.2d 790, 792-93 (Pa. Super. Ct. 1997); see also Nordi v. Keystone Health Plan West, Inc., 989 A.2d 376, 381-83 & n.4 (Pa. Super. Ct. 2010) (addressing the bad faith claim on the merits despite the concession that the insured's coverage claim failed).

Resolution of a coverage claim on the merits in favor of the insurer requires dismissal of a bad faith claim premised on the denial of coverage, because under the circumstances the insurer necessarily has a reasonable basis for denying benefits. See, e.g., Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n.9 (3d Cir. 1999); Treadways, LLC v. Travelers Indem. Co., No. 11-2596, 2012 WL 764917, at *2-*3 (3d Cir. Mar. 12, 2012) (not precedential); Pizzini v. Am. Int'l Specialty

Lines Ins. Co., 249 F. Supp. 2d 569, 570 n.1 (E.D. Pa. 2003).[9]

However, if bad faith is asserted as to conduct beyond a denial of coverage, the bad faith claim is actionable as to that conduct regardless of whether the contract claim survives. See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co., 244 F. App'x 424, 435 (3d Cir. 2007) (not precedential) (where parties agreed policy at issue had been canceled, analyzing bad faith claim because "the bad faith claim [was] based largely on behavior beyond Westchester's denial of the claim"); Messina v. Liberty Mut. Ins. Co., No. 95-7093, 1996 WL 368991, at *3-*5 (E.D. Pa. July 1, 1996) (if refusal to arbitrate was actionable under the bad faith statute, it could be asserted notwithstanding lack of meritorious contract claim).[10]  That distinction has been accepted when, as here, the insured claims that a bad faith

---

[9] The defendant's argument that the bad faith claim necessarily falls with the contract claim is predicated on this line of cases.  The defendant states that "a bad faith claim based solely on an underlying contractual claim generally will fail if . . . the insurer did not have a duty to defend."  Ltr. from Yolanda K. DeSipio, Defendant's Counsel, to the Court, July 16, 2012, at 3-4.  This is correct; in the instant case, however, the plaintiffs allege bad faith going beyond the defendant's denial of coverage.

[10] See also Hampton v. GEICO Ins. Co., 759 F. Supp. 2d 632, 644-47 (W.D. Pa. 2010) (rejecting bad faith claim based on denial of coverage but analyzing it to the extent it alleged selection of biased peer review organization); Frederick & Emily's, Inc. v. Westfield Grp., No. 03-6589, 2004 WL 1925007, at *3 (E.D. Pa. Aug. 27, 2004) (rejecting defendant's motion to sever contract and bad faith claims and observing that "Westfield's contention that Frederick cannot proceed with its § 8371 claim if its breach of contract claim fails is doubtful.").

investigation accompanied a claim denial.  See Rohm & Haas Co. v. Utica Mut. Ins. Co., No. 07-584, 2008 WL 2517176, at *2-*4 (E.D. Pa. June 23, 2008) (at motion to dismiss stage, "there is at least the possibility that [the plaintiff]'s bad faith claim could exist independent of its duty to defend claim"); Moss Signs, Inc. v. State Auto. Mut. Ins. Co., No. 08-164, 2008 WL 892032, at *4 (W.D. Pa. Apr. 2, 2008) (holding that because bad faith was alleged in investigation and in denial of coverage, the plaintiff could "theoretically succeed on either or both" of the claims).

The plaintiffs have alleged that State Farm acted in bad faith by denying their claims and by failing to conduct an adequate investigation.  Pls.' Opp. 1 ("This is an action for . . . bad faith arising out of State Farm's failure to properly investigate and . . . improper disclaimer of coverage.").  Because the defendant is entitled to summary judgment on the breach of contract claim, the plaintiffs may not assert bad faith with respect to the denial of coverage. However, the Court will address on the merits the bad faith claims alleging inadequate investigation.

### 2.   Bad Faith in Investigation

"Bad faith claims are fact specific and depend on the conduct of the insurer vis à vis the insured."  Condio, 899 A.2d at 1143.  The "clear and convincing" evidentiary standard

requires that bad faith be proven through evidence that is so
"clear, direct, weighty and convincing so as to enable the court
to make its decision with a clear conviction." Polselli v.
Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (3d Cir. 1994)
(quotations and citations omitted).  It must be proven and "not
merely insinuated." Terletsky, 649 A.2d at 688.  "Thus, the
plaintiff's burden in opposing a summary judgment motion is
commensurately high in light of the substantive evidentiary
burden at trial." J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d
356, 367 (3d Cir. 2004).

        With respect to the 2010 claim, the record demonstrates
the defendant's thorough investigation of the damage to the
plaintiffs' home.  State Farm sent Warner to the house for a site
visit, wherein he eliminated other potential causes of the
damage, described his thought process to the plaintiff, and made
clear why he had reached the conclusion that the loss was
excluded under the policy.  The plaintiffs have produced no
evidence that this investigation was conducted in bad faith and
the Court will grant the motion with respect to this part of the
bad faith claim.

        On the 2009 investigation, however, material facts are
in dispute as to the conversation between Adam Juliano and
Frances Gold.  The length of Juliano's review itself does not
demonstrate bad faith.  The plaintiffs have produced evidence

that Frances Gold made clear to Juliano during their phone call that water had not been coming through the basement walls; that she asked for an on-site investigation but none was conducted; and that she offered to have an independent investigation conducted as to causation, but State Farm denied the claim in spite of these factors.  Viewed in the light most favorable to the plaintiff, and combined with the defendant's admission that the investigation took twelve minutes total, the evidence could constitute bad faith.  The Court will, therefore, deny the motion to the extent it seeks summary judgment in connection with the investigation of the 2009 claim.

### 3.  Other Asserted Bases for Bad Faith

The plaintiffs also argue that three other pieces of evidence support their claim for bad faith: (1) "abusive conduct" by Roming during Frances Gold's initial 2009 phone call; (2) State Farm's incorrectly describing the Golds' home as containing a fireplace; and (3) the cancellation of their policy in June 2011.  Pls.' Ans. to Mot. ¶ 8.  The first is not properly connected to the conduct of the defendant.  The second does not relate to the 2009 investigation.  The third is not sufficiently supported to substantiate their claim for bad faith.  Thus, none of these allegations may be relied upon by the plaintiffs in supporting their claim for bad faith.

The plaintiffs argue that when Frances Gold called her

-24-

State Farm representative's office, Christine Roming was
uncooperative and "screaming, and . . . was very abusive on the
phone." F. Gold Dep. 101. The plaintiffs refer to Roming as "a
captive of State Farm and within its control." Pls.' Opp. 15-16.
State Farm asserts that Roming's conduct cannot serve as the
basis for a bad faith claim because Roming is not its agent.

The record contains no evidence that Roming was an
agent of State Farm, or that she was subject to the defendant's
control. Without such evidence, the plaintiffs may not state a
bad faith claim against State Farm on the basis of Roming's
behavior. See I.H. ex rel. Litz v. Cnty. of Lehigh, 610 F.3d
797, 802 (3d Cir. 2010) (master-servant relationship required in
Pennsylvania for vicarious liability to attach on the basis of
employee's acts, and party seeking to assert liability bears
burden of proof); see also Johnson v. State Farm Life Ins. Co.,
No. 09-207, 2011 WL 3204735 at *2-*3 (W.D. Pa. July 27, 2011)
(granting insurer's motion for summary judgment on claims for
conversion and violations of the Pennsylvania Viatical
Settlements Act where no proof of master-servant relationship
with independent contractor was presented). The plaintiffs have
not presented any evidence of a master-servant relationship
between Roming and the defendant. Her conduct may not support a
bad faith claim against State Farm.

The Golds also advance an argument that State Farm

exhibited bad faith in erroneously describing their home in the
policy.  This finds no support in the record on summary judgment
other than in the deposition of Frances Gold, in which she
describes a visit she made to her State Farm agent's office and
"saw that he [the agent] had written down two things
incorrect[ly]" in the Golds' file on his computer.  According to
Gold's testimony, she asked that these mistakes be corrected,
they were, and she was given a receipt.  F. Gold Dep. 87:8-18.
This conduct does not import the ill will or dishonest purpose
with respect to insureds that the bad faith statute prohibits.[11]

Finally, the Golds argue that State Farm elected not to
renew the insurance policy at issue in this case "in retaliation
for the Golds' filing of this lawsuit."  They argue that the
timing of this non-renewal, dated June 16, 2011, is evidence of
State Farm's retaliatory motive.  Pls.' Mot. 21 (citing Ex. S).

In further support of this argument the plaintiffs
suggest that State Farm's "refus[al] to provide discovery . . .
related to its underwriting department's decision to not renew
the . . . policy" is suggestive of retaliation.  Id. (citing
Def.'s Resp. to Pls.' First Req. for Production of Documents, Ex.
V at ¶¶ 3-4).  Although some litigation behavior may serve as the

---

[11] Although the statute "encompasses a wide variety of
objectionable conduct," Condio, 899 A.2d at 1142, actionable bad
faith still "imports a dishonest purpose and means a breach of a
known duty (i.e., good faith and fair dealing), through some
motive of self-interest or ill will; mere negligence or bad
judgment is not bad faith."  Klinger, 115 F.3d at 233.

basis for a finding of bad faith, it is not bad faith for an insurer to "take a stand and protect its interests in the normal course of litigation . . . ." Condio, 899 A.2d at 1145.  Section 8371 "clearly does not contemplate actions for bad faith premised upon allegation of discovery violations." O'Donnell ex rel. Mitro v. Allstate Ins. Co., 734 A.2d 901, 908 (Pa. Super. Ct. 1999).

The Court will grant the defendant's motion except to the extent it seeks judgment on the plaintiffs' claim that State Farm acted in bad faith in investigating the claim they made in 2009.  An appropriate order shall issue separately.